# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO.: 3:14CR189 (AVC) |
| Plaintiff | : | |
| | : | |
| V. | : | |
| | : | |
| MICHAEL LOMBARDO, | : | |
| Defendant | : | December 11, 2014 |

## DEFENDANT MICHAEL LOMBARDO'S
## MEMORANDUM IN AID OF SENTENCING

On September 11, 2014 Mr. Lombardo pleaded guilty to an Information charging him with Wire Fraud, in violation of 18 U.S.C. § 1343. Mr. Lombardo's Presentence Investigation Report ("PSR") confirms the parties' calculation of his sentencing guidelines range of 27-33 months' incarceration, with a potential $6,000-$382,137.46 fine. Undersigned counsel respectfully submits that, although this offense is serious in nature, the sentencing factors outlined in 18 U.S.C. § 3553(a) as applied to Mr. Lombardo mitigate in favor of a period of incarceration of a year and a day, with conditions of Supervised Release that ensure Mr. Lombardo obtains and maintains employment so that he can make restitution and support his family. The collateral

consequences associated with this offense constitute significant and fitting punishment in addition to whatever sentence is imposed by the Court.

## 18 USC § 3553(a) FACTORS

### The Nature and Circumstances of the Offense.

As reflected in the PSR, Mr. Lombardo attended college at the University of Connecticut and majored in Business Administration, with a focus on Finance.  Upon graduation, he secured a job at First Republic Group in New York City, where he learned about generating clients and introducing stock options.  In 2000, Mr. Lombardo obtained his Securities Representative Examination ("Series 7")  and Uniform Combined State Law ("Series 66") licenses.  At the time Mr. Lombardo entered the financial industry, the stock market was doing well, the defendant did not have any pressing financial obligations, and nobody was aware of the global financial crisis that would begin several years later.

In 2002, Mr. Lombardo obtained employment at David Lerner and Associates ("DLA").  Mr. Lombardo received extensive sales training at DLA; he was expected to memorize scripts, attend dinner seminars for prospective clients, and make cold calls throughout the day.  DLA expected all of its new employees to generate business immediately.  Although Mr. Lombardo was paid an annual salary, he was required to

bring in at least $70,000 in sales the first year, or face termination.  For the first few years, Mr. Lombardo met his quotas because he was able to sell investment bundles to clients from his prior job and to his friends and family.

Shortly thereafter, Mr. Lombardo's compensation structure changed and his earnings were determined entirely by a commission-based formula.  Although DLA outwardly promoted diversified investment portfolios, the company strongly incentivized its employees to sell Apple Real Estate Investment Trust programs ("Apple REITS").  Mr. Lombardo and other employees stood to make a considerably higher percentage from clients' investments in the Apple REITS than other investments.  Compared to the unpredictability of the stock market, the Apple REITS seemed to be a relatively safe, profitable investment both for DLA's clients and its employees.

In the midst of the changing financial landscape in both the stock market and at DLA, Mr. Lombardo married, and shortly thereafter, he and his wife Kelley had a son.  Two years later, in 2009, they had a daughter.  The defendant and his wife felt it best for their family if Kelley were to stay home to raise their children.  This decision was based on a cost-benefit assessment that so many other families make about working outside of the home given the high cost of daycare.  Mr. Lombardo found himself as the sole provider for his young family.

In early 2011, several of DLA's clients began to question DLA for its failure to disclose the risks associated with particular investments, especially the Apple REITS. The Financial Industry Regulatory Authority ("FINRA") began investigating DLA. When clients learned of the investigation, many wanted to pull their investments out of DLA. Mr. Lombardo's clients were livid when they learned that the Apple REITS were illiquid, and many clients were either placed on a waiting list to withdraw their funds from the REITS, or were only able to withdraw a small percentage of their investment. Having to continually address his clients' concerns, Mr. Lombardo was unable to devote the time necessary to sell investments and generate expected commissions.

Mr. Lombardo grew increasingly concerned about his compensation, and as time passed, began to feel pressure to deal with mounting financial obligations. DLA assured Mr. Lombardo that once the Apple REITS were sold, the company—and its employees—would get a windfall. Based on representations made at company meetings, Mr. Lombardo projected that he would make more than several hundred thousand dollars in commission. Also, as additional assurance and incentive to employees for their loyalty during a "difficult financial period", DLA set up a profit sharing plan. Mr. Lombardo expected to receive approximately $50,000 in additional funds from this profit sharing plan.

Inexcusably, Mr. Lombardo misappropriated money from accounts that he serviced to meet his financial obligations. Even though Mr. Lombardo's intention was to repay the funds once the Apple REITS were sold, months turned into years. Ultimately, and inevitably, one of Mr. Lombardo's customers noticed a discrepancy in her account and DLA discovered the defendant's misconduct. Mr. Lombardo was terminated and this prosecution ensued.

It would be easy to characterize Mr. Lombardo's actions as motivated by greed, but the stimulus behind his conduct was panic. The defendant rented and later owned a home, leased two cars, had two children, and a wife who stayed home to care for them. It appears from a cursory look at the defendant's financial statements that the defendant's salary should have enabled him to support his family. In reality, every month, the defendant grew increasingly anxious about upcoming bills.

Mr. Lombardo felt that there was constant tension between himself and his parents. As Mr. Lombardo was (theoretically) making money from his parents' investments in DLA, they expected him to purchase his grandparents' house. Mr. Lombardo was upset that they were not helping with childcare or providing any other assistance when Mr. Lombardo thought it was obvious that he was his wife were

struggling.[1]  Mr. Lombardo was similarly frustrated that his wife was not assisting financially, and he was concerned that she was not trying hard enough to live within their budget, or meeting her share of the household responsibilities.  Without communicating his needs—or his frustration—to his parents or wife, Mr. Lombardo worried in silence.  The defendant viewed his financial struggles and inability to provide for his family as a sign of personal failure and regarded his financial situation to be inescapable, and irremediable.

As Mr. Lombardo at first became concerned, and then frightened, and then panicked, he exercised poor judgment and committed this offense. In the defendant's version of reality, without the wherewithal to step back and see that he had other options, he made a terrible choice.  In hindsight, the defendant realizes that he rationalized (or justified) his actions—to the extent that he even thought them through—as taking advances against earnings promised to him by the company, rather than stealing funds from clients' accounts.

Mr. Lombardo knows he has committed a serious offense, and is almost surprised at himself for stealing from anyone, let alone people who entrusted their savings to him.

---

[1] Ironically, a large portion of Mr. Lombardo's attributed loss amount accounts for money he took from his parents' accounts, which money he then used to pay them for rent.

He finds it hard to explain how he risked his livelihood, his family, and his freedom when he knew that at some point his actions would be uncovered.

**The History and Background of the Defendant.**

Mr. Lombardo's background is accurately accounted in the PSR.  Mr. Lombardo is the youngest of three children, and comes from an intact, albeit uncommunicative, family.  Mr. Lombardo graduated from college, entered the financial industry, married, and started his own family.  Mr. Lombardo and his wife, Kelley, moved into and later purchased his grandparents' house,[2] which was right next door to and owned by his parents.  Once they had their second child, they agreed that it made sense financially for Kelley to stay home to raise them.  Kelley would re-enter the work force once the children started kindergarten.

In discussing how the defendant engaged in conduct shocking even to his own wife, it seems that his tendency to keep everything to himself and his difficulty communicating led him to feel overwhelmed, and ultimately engage in immoral, unlawful and uncharacteristic behavior.  Now that his conduct has been exposed, he faces

---

[2] When Mr. Lombardo's parents asked their son to purchase the grandparents' home, the defendant agreed to do so even though it was a stretch financially.  Mr. Lombardo believed that it was a good financial investment, taking into account his supervisors' projections of his future income potential.

not just incarceration, but the anger of the victims, the disappointment of his parents and complete loss of trust of his wife.

Mr. Lombardo's parents, as victims of the offense, are extremely angry with their son. They are disappointed in him, to the point that they have made a conscious decision to not assist him throughout this prosecution. They are unwilling to "bail him out" financially, as they feel this is his responsibility. Mr. Lombardo's parents recently bought a retirement home in Florida, and they left Connecticut before Thanksgiving to spend the winter there. It appears that they will be unavailable to provide assistance with childcare if Kelley has an emergency or needs any other kind of help during Mr. Lombardo's incarceration.

While it is one thing to express anger and disapproval, it is another to withdraw support. The lack of communication between the defendant and his parents regarding his offense and resulting prosecution is symptomatic of Mr. Lombardo's family dynamic. Mr. Lombardo is going to have to develop better communication and life management skills to learn to deal with this reality in the future.

Mr. Lombardo has always been a hard worker, and immediately after he was fired from DLA, he started working for a pool cleaning company. Mr. Lombardo worked there until a few weeks ago, when it closed for the season. Mr. Lombardo has been

drastically cutting his family's budget so his wife and children can stay in their house without the threat of foreclosure while he serves his sentence.

Although families are always negatively impacted when a parent goes to jail, Mr. Lombardo's family circumstances are compelling. If any aspect of this case can be considered to be good, Mr. Lombardo's arrest came at a good time in the sense that Mr. Lombardo's youngest child just started kindergarten. In September, Mrs. Lombardo was able to return to work, and she secured a job as a teaching assistant in the Stamford public school system. Mrs. Lombardo plans to continue to work if the defendant is incarcerated, but is anxious over the fact that none of her family members are able to care for her children in the event they get sick. Due to her work schedule, she will have to place her children in an after school program. Mrs. Lombardo's salary is not significant[3] and a large portion of it will go towards child care.

Sadly, Mr. Lombardo serves as his wife's primary support network. Although many of Kelley's friends have been a source of emotional support during this difficult time, Kelley has not seen or spoken to her father in over thirty years; her mother is an alcoholic and recently lost her job; her grandmother passed away a month ago, and she does not have a close relationship with her sister. Mr. Lombardo's sisters have not

---

[3] Mrs. Lombardo currently earns $517.00 net salary every two weeks.

indicated a willingness to help Kelley get through this difficult period. She is scared and anxious, and hopes that the Court will impose a sentence that will enable Mr. Lombardo to provide some sort of stability to their children.

Mr. Lombardo has indicated his intention to do everything he can to make up for his transgressions and he accepts the imminency of incarceration. Regardless of the punishment handed down by the Court, the defendant will be spending many years making reparations to the victims and his family.

**The Need for the Sentence to Reflect the Seriousness of the Offense.**

Often, when individuals come before the Court for sentencing, incarceration is the only available and applicable punishment. For Mr. Lombardo, punishment has already come in many forms. Once DLA discovered that Mr. Lombardo misappropriated funds, they immediately terminated him. He lost his career, licenses, is permanently barred from working in the financial industry (see attached), and now has a federal felony record that will make it extremely difficult for him to compete with other applicants in a saturated job market. Those consequences are devastating to Mr. Lombardo, and are fitting punishment for someone who violates a position of trust in the financial industry. While prison is also an appropriate penalty, the length of his sentence should reflect the fact that he has and will continue to have to deal with other lasting forms of punishment.

**General and Specific Deterrence.**

Regarding general deterrence, undersigned counsel submits that a felony conviction serves general deterrent purposes, especially when those who commit these types of offenses are most affected from sustaining a federal felony conviction.  Further, there is no body of research that supports the correlation between sentence length and deterrence.  The *fact* of incarceration, or even the likelihood of incarceration, for someone who commits such an offense, can be a powerful deterrent.

Regarding specific deterrence, Mr. Lombardo is unlikely to offend again.  Up until the above-captioned matter, the defendant did not have a criminal record and has never been incarcerated.  While collateral consequences often accompany convictions, Mr. Lombardo's termination and permanent bar from the financial industry are significant enough to deter Mr. Lombardo from further misconduct.

Strongly mitigating in Mr. Lombardo's favor is the fact that he has accepted responsibility from the outset of this prosecution.  Mr. Lombardo's timely decision to plead guilty to this offense signifies remorse and warrants consideration.  Also, Mr. Lombardo has had the opportunity to demonstrate his ability to comply with any Court-imposed conditions while on pretrial release.  Mr. Lombardo has been compliant with his schedule and has maintained employment.  Under these circumstances, a sentence of

imprisonment within the guidelines is more than necessary to meet the goals of sentencing.

### **The Need to Provide the Defendant with Educational or Vocational Training, Medical care, or other Correctional Treatment in the most Effective Manner.**

While Mr. Lombardo certainly can benefit from vocational training, he is college educated and intelligent, and can receive professional training while working in the community. Correctional treatment in the community would allow the defendant to earn money to be used towards restitution and to support his family. As noted above, a sentence of incarceration is going to have a devastating effect on the defendant's wife and two young children. Through home confinement, the defendant's freedom can be restricted in such a way that he is only permitted to leave his house for work-related purposes; he will experience a loss of liberty while supporting his family and making restitution.

Importantly, Mr. Lombardo engaged in mental health counseling while on pretrial release. As an active participant in counseling, Mr. Lombardo has made a thoughtful assessment of his situation and is focused on putting the incarceration component of his sentencing behind him so that he can secure employment, and start making restitution and support his family. Mr. Lombardo should be ordered to continue with mental health counseling so that he can address underlying issues that may have led him to engage in

this conduct. Such treatment would be most effective in the community so Mr. Lombardo can address problems together with his wife. Both partners have matters to work through related to her anger towards him for having committed this offense, and his previously uncommunicated issues with the financial structure of their family that led him to believe that he did not have any other option.

Mr. Lombardo does not drink or use drugs to excess, and he does not have any addictive behavior. Even without Court intervention, this process has been a massive inducement for him to reassess all aspects of his life.

## **CONCLUSION**

Undersigned counsel submits that this prosecution, and having a permanent federal felony conviction on his record, permanent bar from the financial industry and any period of incarceration are more than sufficient to meet the goals of sentencing. While arguably punishment is warranted anytime an offense is committed, in this particular instance, a sentence of a year and a day with any additional period of home confinement that the Court determines is necessary would achieve the goals of sentencing.

RESPECTFULLY SUBMITTED,

THE DEFENDANT,
MICHAEL LOMBARDO


BY__/s/ Audrey Felsen_____
    Audrey A. Felsen, Esq.
    Koffsky and Felsen, LLC
    1150 Bedford Street
    Stamford, CT  06905
    Tel.: 203-327-1500
    Fax: 203-327-7660
    Federal Bar No.: ct20891
    afelsen@aol.com


**CERTIFICATION**

    THIS IS TO CERTIFY that on December 11, 2014, a copy of the foregoing was hand delivered to anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CMECF System.


    ____/s/ Audrey Felsen____
        Audrey A. Felsen